UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION
CIVIL ACTION NO. 1:17-CV-00108-GNS-HBB

NATHANIEL EDWARD MAYSEY                                                          PLAINTIFF

v.

HENKEL CORPORATION;
HENKEL AG & CO. KGAA; and
NEMAK USA, INC.                                                                   DEFENDANTS

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendant's Motion for Summary Judgment (DN 134). The motion is ripe for adjudication. For the reasons that follow, the motion is **DENIED**.

### I.     BACKGROUND

Defendant Nemak USA Inc. ("Nemak") die casts aluminum automobile parts. (Byrd Dep. 14:5, Oct. 30, 2018, DN 134-3; Pl.'s Mem. Supp. Resp. Def.'s Mot. Summ. J. 1, DN 136-1 [hereinafter Pl.'s Resp.]). Magna-Tech Manufacturing, LLC ("Magna-Tech")[1] impregnates die-casted aluminum automobile parts. (Byrd Dep. 14:5-6; Pl.'s Resp. 1). On or about August 5, 2014, Magna-Tech and Nemak entered into a Services Agreement whereby Magna-Tech would "perform Impregnation Services" for Nemak from June 12, 2014, to December 31, 2019. (Def.'s Mot. Summ. J. Ex. 2, ¶¶ 1.1-1.2, DN 134-2 [hereinafter Services Agreement]). The Services Agreement allowed Magna-Tech to perform its services for Nemak by operating within Nemak's facility in Glasgow, Kentucky. (Services Agreement ¶ 2.1).

---

[1] As Nemak notes in its motion, Henkel acquired Magna-Tech in 2015. (Def.'s Mem. Supp. Mot. Summ. J. 2, DN 134-1).

1

Plaintiff Nathaniel Edward Maysey ("Maysey"), was employed by Express Services, Inc. ("Express Services"), a temporary staffing company. (Pl.'s Resp. 3). He was assigned to work for Magna-Tech on June 1, 2016. (Pl.'s Resp. 3). Maysey was injured when his arm was caught in a rotating centrifuge. (Pl.'s Resp. 5).

Maysey brought suit against Defendants in Kentucky state court, claiming negligence and strict liability, and Defendants subsequently removed this case to federal court. (Notice Removal ¶¶ 1-2, DN 1). Nemak now moves for summary judgment, disclaiming any liability for Maysey's injuries. (Def.'s Mot. Summ. J., DN 134).

## II. JURISDICTION

This Court has subject-matter jurisdiction of this matter based upon diversity jurisdiction. *See* 28 U.S.C. § 1332(a)(1).

## III. STANDARD OF REVIEW

In ruling on a motion for summary judgment, the Court must determine whether there is any genuine issue of material fact that would preclude entry of judgment for the moving party as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of stating the basis for the motion and identifying the evidence demonstrating an absence of a genuine dispute of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If the moving party satisfies its burden, the nonmoving party must then produce specific evidence proving the existence of a genuine dispute of fact for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

While the Court must view the evidence in the light most favorable for the nonmoving party, the nonmoving party must do more than merely show the existence of some "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,

586 (1986) (citation omitted). Rather, the nonmoving party must present facts proving that a genuine factual dispute exists by "citing to particular parts of the materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute . . . ." Fed. R. Civ. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient" to overcome summary judgment. *Anderson*, 477 U.S. at 252.

## IV. DISCUSSION

Nemak asserts that Kentucky premises liability and workers' compensation law absolve it from any liability in this case. Kentucky state law forms the substantive law used to evaluate Maysey's claim. *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 417 (2010) ("[F]ederal courts sitting in diversity 'apply state substantive law and federal procedural law.'" (quoting *Hanna v. Plumer*, 380 U.S. 460, 465 (1965))).

Nemak owns the property on which Maysey suffered his injuries. (Services Agreement 1). Nemak and Magna-Tech entered into an agreement whereby Magna-Tech was allowed to install equipment at Nemak's Glasgow facility and perform impregnation services for ladder frames which Magna-Tech then sold to Nemak. (Services Agreement ¶ 1.2). Express Services assigned Maysey to work for Magna-Tech at Nemak's Glasgow facility. (Pl.'s Resp. 3).

### A. Premises Liability

Characterizing the relationship between itself and Magna-Tech as one of landlord-tenant, Nemak argues that the following premises-liability rule applies to the facts of this case:

> A possessor of land who leases a part thereof and retains in his own control any other part which the lessee is entitled to use as appurtenant to the part leased to him, is subject to liability to his lessee and others lawfully upon the land with the consent of the lessee or a sublessee for physical harm caused by a dangerous condition upon that part of the land retained in the lessor's control, if the lessor by the exercise of reasonable care could have discovered the condition and the unreasonable risk involved therein and could have made the condition safe.

3

*Davis v. Coleman Mgmt. Co.*, 765 S.W.2d 37, 38-39 (Ky. App. 1989) (quoting Restatement (Second) of Torts § 360). In arguing that *Davis* applies, Nemak's premise is that it leased to Magna-Tech the area where Maysey was injured and did not retain control of that area in any way; thus, it is not liable for Maysey's injuries.[2] (Def.'s Mem. Supp. Mot. Summ. J. 4-9, DN 134-1; Def.'s Reply Mot. Summ. J. 1-6, DN 137 [hereinafter Def.'s Reply]).

Nemak's position is undermined by the terms of the Service Agreement. Nemak first points to Paragraph 2.1 of the Services Agreement, which states "Magna-Tech will install, set-up and maintain equipment in the Glasgow Facility," for the proposition that that Magna-Tech possessed all maintenance responsibilities and that Nemak lacked control over the area where Maysey was injured. Nowhere in that contract, however, did Nemak convey to Magna-Tech a leasehold interest in any specific portion of the Glasgow plant. Review of the Services Agreement reveals no suggestion that Nemak relinquished its right as the owner of the premises to enter onto the area where Magna-Tech was performing services. Rather, the Services Agreement is more akin to the agreement at issue in *Mercantile Realty* where the court stated: "Section (b) of the

---

[2] Nemak asserts that the relationship between itself and Magna-Tech is one of landlord-tenant, presumably to prevent application of the seemingly greater duty applicable to landowner-licensee or landowner-invitee relationships. *See Scuddy Coal Co. v. Couch*, 274 S.W.2d 388, 390 (Ky. 1954) ("The owner or occupant of premises owes a duty to the invitee to use ordinary care to have the premises in reasonably safe condition . . . ."); *Smith v. Smith*, 563 S.W.3d 14, 18 n.2 (Ky. 2018) (possessor of land liable to licensee if "possessor knows or has reason to known of the condition and should realize that it involves an unreasonable risk of harm to such licensees, and should expect that they will not discover or realize the danger, . . . fails to exercise reasonable care to make the condition safe, or to warn the licensees of the condition and the risk involved, and . . . the licensees do not know or have reason to know of the condition and the risk involved."). Maysey, as either an employee or independent contractor of Magna-Tech, could potentially be characterized as either a licensee or invitee. *See Auslander Props., LLC v. Nalley*, 558 S.W.3d 457, 467 (Ky. 2018) (applying landowner-licensee duty owed to landowner-independent contractor relationship); *Brewster v. Colgate-Palmolive Co.*, 279 S.W.3d 142, 149-50 (Ky. 2009) (applying landowner-invitee duty owed to duty owed by landowner to employee of independent contractor).

[contract] gives to the shoe company a right to occupy sufficient space with its shoes for their proper exhibitions, but it does not say where this shall be or give the shoe company any right to the possession or control of any part of this store. It was a mere license . . . ." *Mercantile Realty*, 92 S.W.2d at 839 (citations omitted). Similarly, the Services Agreement authorizes Magna-Tech to enter onto Nemak's property, to "install, set-up and maintain equipment," and perform impregnation services. (Services Agreement ¶¶ 1.1-2.7).

There is no language in the Services Agreement indicating that Nemak relinquished control of the area it allowed Magna-Tech to use in performing its impregnation services. Instead, Magna-Tech was merely allowed to install its machinery and to operate on Nemak's premises. As such, Nemak's argument that Magna-Tech was its lessee by virtue of the Service Agreement is rejected. *See Waller v. Morgan*, 57 Ky. 136, 142 (1857) ("To create the relation of landlord and tenant, no particular words are necessary, but it is indispensable that it should appear to have been the intention of one party to dispossess himself of the premises, and of the other to enter and occupy as the former himself had a right to do, pursuant to the agreement between them."). "When the use or occupation of premises is given for a special purpose, in which the owner is concerned, the owner retaining control and legal possession[,] . . . no tenancy is created." *Mercantile Realty Co. v. Allen Edmonds Shoe Corp.*, 92 S.W.2d 837, 839 (Ky. 1936) (internal quotation marks omitted).

Nemak points only to the Services Agreement to evidence the existence of a landlord-tenant relationship between itself and Magna-Tech. Kentucky law, however, does not appear to confine the scope of evidence reviewed in determining whether a landlord-tenant relationship exists between two parties to merely the written agreement between those parties—in other words, the parties can create a landlord-tenant relationship through their actions. *See Miracle v. Stewart*, 128 S.W.2d 613, 616 (Ky. 1939) (stating that in the context of an employer providing housing to

5

an employee, "[w]here it appears that the occupation of the premises is more than an incident to service and the employer has parted with his control during the existence of the contract of employment, . . . there is obviously created the landlord and tenant relationship." (citation omitted)); *Pinnell v. Woods*, 121 S.W.2d 679, 679-80 (Ky. 1938) (examining relationship between the parties, with no mention of a written agreement, in concluding that landlord-tenant relationship existed).

Whether Nemak manifested the intent to dispossess itself of the relevant area so as to establish a landlord-tenant relationship and whether Magna-Tech possessed exclusive control over the area where Maysey was injured depends upon the facts and circumstances surrounding Magna-Tech's supposed tenancy. Nemak points to the deposition testimony of Magna-Tech employee Todd Troyer, who testified that he only requested assistance from Nemak for the robotics cell. (Troyer Dep. 25:6-9, DN 134-5). The robotics cell is located on a different "line," Line 76, from the line where Maysey was injured, Line 46. (Troyer Dep. 25:13-14; Def.'s Mem. Supp. Mot. Summ. J. 1; Pl.'s Resp. 3). Nemak additionally points to the deposition testimony of one of its own employees, Tammy Byrd ("Byrd"), who stated she was not aware of maintenance performed by Nemak in the pertinent area. (Byrd Dep. 12:24-13:3). Finally, Nemak points to a safety assessment conducted by Henkel, which states that "Nemak provides facilities maintenance resources for any work required which is not directly related to Magna-Tech equipment. For instance, facility electrical maintenance is performed by Nemak. However, any repair or service type work on Magna-Tech equipment is managed by Magna-Tech, typically through contracted resources." (Def.'s Mot. Summ. J. Ex. 5, at 2, DN 134-6).

Nemak does not articulate how the delegation of maintenance responsibilities to Magna-Tech establishes Nemak's intent to dispossess its property and create a landlord-tenant relationship

6

for the disputed area. None of the evidence cited by Nemak establishes such a cessation of control. The Services Agreement does not indicate an *exclusive* responsibility on the part of Magna-Tech to maintain the area in question; neither does the Henkel safety report. Moreover, Troyer's statement that he only asked for maintenance assistance on an area unrelated to the area in question does not necessarily mean that Nemak did not have the right to enter into the area where Maysey was injured to perform maintenance. Likewise, Byrd's lack of knowledge of maintenance performed by Nemak in the relevant area is inconclusive, especially when she admitted that "it's not [her] responsibility" to review maintenance records. (Byrd Dep. 13:6-9). Finally, the parties are apparently aware of Nemak's maintenance logs, which presumably would reflect maintenance performed by Nemak in the area but are not in the record. (Pl.'s Resp. 2; Def.'s Reply 2).

Nemak's assertion that an Occupational Safety and Health Administration ("OSHA") report establishes that Nemak had no control over the relevant area suffers from the same defect. An OSHA report generated shortly after Maysey's accident states that the "contract agreements between Nemak & Magna-Tech separated the areas of responsibility. . . . Nemak could not have been aware of any volatile condition." (Def.'s Mot. Summ. J. Ex. 10, at 3, DN 134-11). OSHA's characterization of the Services Agreement, or other agreements between Nemak and Magna-Tech that have not been made part of the record, is not determinative of Nemak's right of control over the area where Maysey was injured. Even accepting OSHA's interpretation of the relationship between Nemak and Magna-Tech, OSHA did not determine that Nemak had no right to control the area where Maysey was hurt.

Finally, Nemak generally points to other deposition testimony as supporting its assertion that Nemak had no control over the relevant area. Nemak first points to other testimony from Byrd:

> Q. . . . Specifically, did Nemak provide utilities, space, plumbing, electric for Magna-Tech to utilize?
> A. We did, but only in part that it benefited us in price, so it was an agreement that was their area to work in, not ours, so we didn't go in that area unless we notified them.
> Q. What do you base that upon, that answer?
> A. Because that was the agreement that we had with them. It was their space to operate within. We did not tell them how to operate. We're die casters. We're not impregnators. So, the agreement was they would give us a benefit in the price by us providing the space and the utilities, so we were compensated in the price for that area that they used.

(Byrd Dep. 13:21-14:9). Nemak also points to the deposition of another Nemak employee, Barry Brown ("Brown"), who indicated that he rarely visited the relevant area and when he did he was escorted by a Magna-Tech employee. (Brown Dep. 27:7-25, Oct. 31, 2018, DN 134-12). Nemak's lack of control over the relevant area, however, is undermined by an email sent by Brown to a Magna-Tech employee suggesting that Nemak could enter into the area used by Magna-Tech whenever it wanted, particularly to address safety issues: "As I've stated previously, Nemak must ensure that the line is now safe to run in our plant prior to your restart. Our first requirement is the written safety risk assessment. If Sean is coming on Friday to assess the equipment for the report, when can we expect the actual report? We want to ensure that Article 3.2 of our contract is being met." (Pl.'s Resp. Def.'s Mot. Summ. J. Ex. 3, at 1, DN 136-4). Viewing the email in the light most favorable to the non-moving party—i.e., Maysey—Brown's communication suggests that Nemak may have exercised control over the area in question, particularly relating to Magna-Tech's compliance with safety standards.

Nemak's use of deposition testimony from two other Nemak employees, Charles Burgess ("Burgess") and Alan Matthews ("Matthews"), is similarly unavailing. Burgess testified that Magna-Tech prohibited him from speaking with Magna-Tech personnel after Maysey's accident, and Matthews testified that Magna-Tech's lawyers prohibited him from entering into the relevant

area during the OSHA investigation. (Burgess Dep. 32:15-17, Feb. 16, 2018, DN 137-8; Matthews Dep. 10:1-7, Feb. 16, 2018, DN 137-9). This testimony does not conclusively establish Nemak's cessation of control over the relevant area during the critical timeframe—i.e., *before* the accident. Control exerted by either party *after* Maysey's injury could not conclusively establish control leading up to the accident.

Whether the relationship between Nemak and Magna-Tech is one of landlord-tenant depends upon disputed facts which preclude summary judgment in Nemak's favor. Nemak has not pointed to evidence of record to conclusively support its assertion that Magna-Tech possessed "exclusive" control over the area where Maysey suffered injuries so as to defeat Maysey's claims. Summary judgment on this point is not warranted.

B. **Workers' Compensation Liability**

Nemak next argues that "up-the-ladder immunity" applies to absolve it from liability to Maysey. "Up-the-ladder immunity" is a concept derived from the combination of two Kentucky workers' compensation statutes, KRS 342.690(1) and 342.610(2)(b), and explained by the Kentucky Supreme Court in *General Electric Co. v. Cain*, 236 S.W.3d 579 (Ky. 2007):

> If premises owners are "contractors" as defined in KRS 342.610(2)(b), they are deemed to be the statutory, or "up-the-ladder," employers of individual who are injured while working on their premises and are liable for workers' compensation benefits unless the individuals' immediate employers of the workers have provided workers' compensation coverage. If deemed to be "contractors," the owners, like any other employers, are immune from tort liability [exclusive remedy immunity] with respect to work-related injuries whether or not the immediate employer actually provided workers' compensation coverage. Thus, *whether an owner is entitled to "exclusive remedy" immunity depends upon whether the worker was injured while performing work that was "of a kind which is a regular or recurrent part of the work of the trade, business, occupation, or profession" of the owner. If so, the owner is immune; if not, the owner is subject to tort liability*.

*Id*. at 585 (alterations in original) (emphasis added).

9

The inquiry therefore turns upon whether Maysey was injured while performing work of a kind which is a regular or recurrent part of the work of the trade, business, occupation, or profession of Nemak. *Compare Dunn v. Corning, Inc.*, 575 F. App'x 644, 650 (6th Cir. 2014) (concluding that the premises owner had up-the-ladder immunity for an employee of an electrical contractor who was performing work that was a regular part of the premise owner's business at the time the employee was injured), with *Commonwealth, Uninsured Emp'rs' Fund v. Old Taylor Partners, LLC*, No. 2011-SC-000694-WC, 2012 WL 6649227, at *1-2 (Ky. Dec. 20, 2012) (rejecting the application of the up-the-ladder immunity to claim asserted by employee of demolition company injured while demolishing warehouses for investment company which did not perform demolition as a regular and recurrent part of its business). Without pointing to any evidence of record to support its assertion, Nemak proclaims its die casting goes "hand-in-hand" with Magna-Tech's impregnation operation (in which Maysey was engaged), and further, "[i]mpregnation of parts is clearly [a] regular aspect of production of complex aluminum components which Nemak simply chooses to utilize contractors, like Magna-Tech, to perform at their facilities." (Def.'s Reply 7).

Simply put, the accuracy of Nemak's assertions is a genuine issue of material fact precluding the grant of summary judgment in Nemak's favor. Not only does Nemak fail to point to any evidence of record to support its contention, testimony from one of Nemak's employees indicates that impregnators do not perform work of a kind which is a regular or recurrent part of the business of die casters like Nemak. As noted above, Byrd testified: "We're die casters. We're not impregnators." (Byrd Dep. 14:5-6). This testimony, viewed in the light most favorable to Maysey, indicates that the work of impregnators is *not* of a kind which is a regular or recurrent part of the work of die casters, but instead is a distinct line of work.

Nemak finally argues that this Court should simply replicate its decision to dismiss Magna-Tech from this lawsuit based on the same "up-the-ladder immunity" concept. As specified in the prior ruling, however, Magna-Tech constitutes an "employer" of Maysey entitled to "up-the-ladder immunity" because Maysey performed work of a kind which is a regular or recurrent part of Magna-Tech's business, impregnation. (Order Dismissing Magna-Tech 2-3, DN 124). As it relates to the motion at hand however, whether Maysey and Magna-Tech's impregnation work constitutes work of a kind which is a regular or recurrent part of Nemak's die-casting operation presents a factual issue.

Viewing the evidence in the light most favorable to Maysey, the nonmoving party, whether up-the-ladder immunity applies to absolve Nemak from any liability rests on a genuine issue of material fact precluding summary judgment in Nemak's favor.

## V. CONCLUSION

For the reasons set forth above, **IT IS HEREBY ORDERED** that Defendant Nemak USA Inc.'s Motion for Summary Judgment (DN 134) is **DENIED**.

Greg N. Stivers, Chief Judge
United States District Court

December 16, 2019

cc: counsel of record