UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION
CIVIL ACTION NO. 1:17-CV-00108-GNS

NATHANIEL EDWARD MAYSEY                                         PLAINTIFF

v.

HENKEL CORPORATION; and
NEMAK USA INC.                                                 DEFENDANTS

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Motions in Limine to Exclude Expert Testimony filed by Plaintiff Nathaniel Edward Maysey ("Maysey") (DN 168, 169); Maysey's Motion for Partial Summary Judgment (DN 170); Motion to Exclude Expert Testimony filed by Defendant Nemak USA Inc. ("Nemak") (DN 171); Nemak's Motion for Summary Judgment (DN 172); and Motion for Summary Judgment filed by Defendant Henkel Corporation ("Henkel") (DN 173).  The motions are ripe for adjudication.

## I.    STATEMENT OF FACTS AND CLAIMS

Maysey was injured in 2016, while working for Magna-Tech Manufacturing ("Magna-Tech") at a plant in Glasgow, Kentucky, owned by Nemak.[1]  (*See* Troyer Dep. 100:6-12, Nov. 30, 2017, DN 173-2).  Nemak  casts aluminum automobile components.  (Second Am. Compl. ¶ 6).  Henkel is the parent corporation of Magna-Tech, which operated "impregnation machines" within

---

[1] Maysey worked for Magna-Tech through a service agency, Express Services, Inc. ("Express"). (Second Am. Compl. ¶ 3, DN 93).  Third-party claims against Magna-Tech and Express were dismissed due to the exclusive remedies provision of the Kentucky Worker's Compensation Act. (Order, DN 124).

the Nemak facility pursuant to a Service Agreement between Nemak and Magna-Tech.  (Second Am. Compl. ¶¶ 10-11(A); Def.'s Mot. Summ. J. Ex. 1, DN 134-2).  Maysey lost his arm while operating a centrifuge on Line 46, which was part of the impregnation process, due to the deactivation of a safety device on the machine.  (Morley Dep. 26:3-14, 31:16-21, Oct. 10, 2017, DN 170-15).  The safety lid for the impregnation machine was bypassed and the machine was allowed to operate with the lid up, rather than down.  (*See* Second Am. Compl. ¶ 11(C)(4)). Maysey filed the instant suit against Henkel, as the parent of Magna-Tech, and Nemak USA, as owner of the plant where Maysey was injured.  (*See* Second Am. Compl., DN 93).

## II.     JURISDICTION

This Court has subject-matter jurisdiction of this matter based upon diversity jurisdiction. *See* 28 U.S.C. § 1332(a)(1).  Venue is proper as the nucleus of events occurred in Glasgow, Kentucky.

## III.     DISCUSSION

### A.     Motions for Summary Judgment (DN 170, 173)

Maysey and Henkel have filed competing summary judgment motions.  (Pl.'s Partial Mot. Summ. J. DN 170; Def.'s Mot. Summ. J., DN 173).  Nemak has also filed a motion for summary judgment against Maysey.  (Def.'s Mot. Summ. J., DN 172).  Each is addressed in turn.

In ruling on a motion for summary judgment, the Court must determine whether there is any genuine issue of material fact that would preclude entry of judgment for the moving party as a matter of law.[2]  *See* Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of stating the basis for the motion and identifying evidence in the record that demonstrates an absence of a

---

[2] This matter is governed by Kentucky law, which neither party contests.  "A federal court sitting in diversity applies the substantive law of the state in which it sits."  *Hayes v. Equitable Energy Res. Co.*, 266 F.3d 560, 566 (6th Cir.2001) (citations omitted).

genuine dispute of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If the moving party satisfies its burden, the non-moving party must then produce specific evidence proving the existence of a genuine dispute of fact for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

While the Court must view the evidence in the light most favorable to the non-moving party, the non-moving party must do more than merely show the existence of some "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citation omitted). Rather, the non-moving party must present specific facts proving that a genuine factual dispute exists by "citing to particular parts of the materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute . . ." Fed. R. Civ. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient" to overcome summary judgment. *Anderson*, 477 U.S. at 252.

### 1. *Maysey's Negligence Claim Against Henkel*

An employer's liability to its employee for a work-related injury is typically limited under Kentucky law to benefits under the Kentucky Workers' Compensation Act, KRS 342.690. Generally, the employer's immunity from suit extends to its parent corporation. "[A] subsidiary which provides workmen's compensation should be treated as having terminated the derivative liability of its parent or principal by satisfaction of the claim." *Boggs v. Blue Diamond Coal Co*., 590 F.2d 655, 663 (6th Cir. 1979) (citation omitted). As reflected by Magna-Tech's dismissal from this action, there is no question that Magna-Tech and Express provided workers' compensation coverage for Maysey. (Order 3, DN 124).

Both Maysey and Henkel point to *Boggs*, which recognized an exception to the general rule, holding that notwithstanding the Kentucky Workers' Compensation Act, "a parent [corporation] is not immune from tort liability to its subsidiary employees for its own, independent acts of negligence." *Boggs*, 590 F.2d at 663. In *Boggs*, the lower court found the parent's assumption of control over the subsidiary indicated a "primary responsibility" for safety functions at the subsidiary where the parent coal company allegedly removed ventilation and safety devices from a coal tunnel and concealed the changes from federal mine inspectors who would have immediately interceded had they known of the changes. *Id.* at 657-58. In allowing the negligence claim against the parent company, the Sixth Circuit expressly noted that the parent entered into sales contracts for the coal produced by the subsidiary, invoiced customers and deposited the income into parent's account, and provided management, engineering, and safety services to the subsidiary. *Id.* The court found the parent corporation undertook "the primary responsibility" for subsidiary safety and therefore was potentially responsible for an injury to the subsidiary's employee. *Id.* at 658. Thus, "a corporation may be found liable to its subsidiary's employees in tort for independent acts of negligence if it has undertaken the duty to prevent injuries to the subsidiary's employees." *Hinkle v. Delavan Indus., Inc.*, 24 F. Supp. 2d 819, 821 (W.D. Tenn. 1998); *see also Boggs*, 590 F.2d at 663; *Gaines v. Excel Indus., Inc.*, 667 F. Supp. 569 (M.D. Tenn.1987).

The standard for potential liability against Henkel turns on whether it assumed a duty to keep the premises where Maysey was injured safe and whether that duty, if applicable, was breached. *Id.* at 663 ("The parent should be liable under customary principles of the common law for harm resulting from its own negligent or reckless conduct." (citing Restatement (Second) of Agency § 213 (1958)). Claims of common-law negligence require: "(1) the defendant owed the

plaintiff a duty of care, (2) the defendant breached the standard by which his or her duty is measured, and (3) consequent injury." *Pathways, Inc. v. Hammons*, 113 S.W.3d 85, 88 (Ky. 2003) (citing *Mullins v. Commonwealth Life Ins. Co.*, 839 S.W.2d 245, 247 (Ky. 1992)).

In the instant case, Maysey argues that Henkel failed to timely warn Magna-Tech's Glasgow employees that Line 46 was dangerous, and that Henkel should have terminated the operation of Line 46 pending remediation.  (*See* Pl.'s Mem. Supp. Partial Mot. Summ. J. 17, DN 170-1).  Maysey must, however, offer proof that this duty was undertaken by Henkel to provide safety services for Magna-Tech's employees. *Rick v. RLC Corp.*, 535 F. Supp. 39, 44 (E.D. Mich. 1981) ("The *Boggs* case does not relieve the subsidiary's employee of the burden of proving the elements of his negligence case against the parent, including the threshold element of a duty owed by the parent to the subsidiary or its employees."), *aff'd*, No. 82-1059, 1983 U.S. App. LEXIS 12283 (6th Cir. Dec. 7, 1983).  Ultimately, Maysey's argument fails as there is no evidence that Henkel assumed a duty to make Magna-Tech's premises safe or warn Magna-Tech's employees of any dangers.

The Restatement (Second) of Torts § 324A, known as the "Good Samaritan" doctrine, is relied upon by courts, including those interpreting Kentucky law, addressing the question of a parent's negligence in the safety aspects of its subsidiary. *McGowan v. Cooper Indus., Inc.*, 863 F.2d 1266, 1270 (6th Cir. 1988).  Section 324A provides:

> One who undertakes, gratuitously or for consideration, to render services to another
> which he should recognize as necessary for the protection of a third person or his

things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if

> (a)     his failure to exercise reasonable care increases the risk of such harm, or
> (b)      he has undertaken to perform a duty owed by the other to the third person, or
> (c)     the harm is suffered because of reliance of the other or the third person upon the undertaking.

Restatement (Second) of Torts § 324A (1965).  "In an action under § 324A, '[t]he threshold issue is typically whether the [defendant] undertook to render services . . . to the plaintiffs or for the benefit of plaintiffs.'"  *Merrill ex rel. Est. of Merrill v. Arch Coal, Inc.*, 118 F. App'x 37, 44 (6th Cir. 2004) (quoting *Good v. Ohio Edison Co.*, 149 F.3d 413, 420 (6th Cir. 1998)).

In *Gaines v. Excel Industries*, the court found the parent responsible for safety violations because it undertook safety inspections of its subsidiary's plant and the equipment, and conducted safety audits of the plant where the subsidiary's employee was injured.  *Gaines*, 667 F. Supp. at 572 nn.3-4.  Section 324A(b) was interpreted to impose liability to the extent the parent's services were rendered primarily to benefit others, not for the parent's own self-interest.  *Id.* at 573.  The court determined that under Section 324A, questions of fact remained as to whether the parent company undertook the safety inspections, audits, and reviews primarily for its own benefit or for the benefit of the subsidiary or the subsidiary's employees.  *Id.*

By contrast, in *Hinkle*, the district court found that the existence of a parent company's task force which looked for ways to reduce accidents and injury costs was **not** sufficient to find that the parent had assumed control over the subsidiary's safety functions.  *Hinkle*, 24 F. Supp. 2d at 822 ("[I]t is undisputed that the main purpose of the Herron Task Force was to gather information on injuries and reduce worker's compensation costs.").  The court noted that the subsidiary "maintained the primary role in preventing accidents" and held that the parent was not liable

6

because it "did not become involved in the day-to-day monitoring of safety, nor did it usurp or assume the subsidiaries' responsibility for ensuring safety." *Id*.

Similarly, in *Rick*, the parent corporation made frequent inspections of the subsidiary's equipment and reviewed maintenance records, after which the parent would meet with subsidiary personnel and discuss equipment issues. *Rick*, 535 F. Supp. at 46. Despite the parent's involvement, the court found "there is no evidence that [] [the parent] specifically agreed or promised to provide accident prevention services to [the subsidiary]." *Id.* Interpreting *Boggs*, the court stated: "[A] parent [is not] liable for injuries caused to a subsidiary's employees in the absence of evidence establishing a duty from the parent to a subsidiary or its employees. The nonexistence of immunity from liability, of course, is not the same as the existence of liability." *Id.* at 44.

Before it acquired Magna-Tech as a subsidiary, Henkel conducted "due diligence" to determine how the newly acquired company would be integrated, what remedial action would be required, and how much time it would take to implement any remedial action for the required operations. (*See* Nakada Dep. 21:14-19, June 19, 2019, DN 170-5). None of Henkel's due diligence revealed major health or safety risks at Magna-Tech in Glasgow or that Line 46 was operating with the centrifuge lid up. (*See* Nakada Dep. 75:1-8, DN 180-10). Maysey claims that Henkel was aware that there were issues with centrifuge guarding at Magna-Tech's Glasgow plant because these same issues were observed at other Magna-Tech facilities. (Pl.'s Reply Partial Mot. Summ. J. 7, DN 185). While Henkel had seen impregnation machines at other facilities operate without guards, there is no evidence that Henkel was specifically aware of this issue in Glasgow or that Henkel had observed other sites operating the centrifuge with the safety lid up. (Drzewiecki Dep. 116:1-22, June 27, 2018, DN 190-4). Maysey's argument regarding Henkel's due diligence

7

inquiry is unavailing.  Henkel's review of Magna-Tech's operations *before purchase of the subsidiary* could not have constituted an assumption of any responsibility for Magna-Tech's safety protocols.  Henkel at that point would have only been a prospective buyer of the company.

After it bought Magna-Tech, Henkel performed one other assessment of Magna-Tech's operations prior to Maysey's injury, in response to reports of fire and wastewater issues in March 2016.[3]  (Sharron Dep. 61:17-62:4, June 28, 2018, DN 173-7).  The March 2016 site visit was conducted to "get a general impression" and "[t]o verify and scope the due diligence items for the business so they could scope a budget for remediation."  (Sharron Dep. 76:19-22, DN 173-7; Drzewiecki Dep. 114:20-22, DN 173-8).  The assessment report states, "the purpose of this visit was to . . . determine whether there are any significant gaps or deviations from regulatory requirements or Henkel safety health and environmental (SHE) policies and procedures."  (Def.'s Mot. Summ. J.  Ex. I, at 20, DN 173-9).  Significantly, Line 46 where Maysey was injured was not in use at the time of Henkel's March 2016 assessment; in fact, line 46 was in a temporary location and was not running.  (Sharron Dep. 105:13-106:1, DN 173-7).[4]  Henkel personnel also testified that when the need for corrective action is identified, the responsibility for correction is with the facility owner.  (Drzewiecki Dep. 17:2-24, DN 173-8).  Issues generally observed during the assessment were addressed in the report by Henkel, stating "there were a number of machine

---

[3] According to Henkel, an assessment is "less structured" than an audit.  (Drzewiecki Dep. 114:8-15, DN 190-4).
[4] A point-of-operation guard was in place on Line 46 in the form of a centrifuge lid with an interlock device.  (Sharron Dep. 161:2-19, DN 173-7).  Because the line was not running at the time of the March 2016 assessment, there was no way to ascertain whether the machine was operated with the lid up or down.  (Sharron Dep. 161:2-19, DN 173-7).  Henkel personnel testified that Magna-Tech specifically represented to them that the machine was being operated with the lid down.  (Sharron Dep. 42:5-9, DN 173-7).  Magna-Tech's on-site manager, Todd Troyer, stated that it was Magna-Tech personnel who allowed the centrifuge to operate with the lid open.  (*See* Troyer Dep. 113:20-114:6, DN 173-2).

guarding deficiencies noted during the assessment" that would need to be promptly remediated. (Def.'s Mot. Summ. J. Ex. I, at 23).  Of crucial importance, the March 2016 assessment report specified that "**any repair or service type work on Magna-Tech equipment is managed by Magna-Tech, typically through contracted resources**."  (Def. Mot. Summ. J. Ex. I, at 21 (emphasis added); Drzewiecki Dep. 134:16-24-135:1-15, DN 134-9).

Site visits alone are not sufficient to establish that a parent company has undertaken the responsibility to maintain a safe premises in its subsidiary.  As the Sixth Circuit has noted:

> Such [visits] . . . do not constitute evidence of a "specific undertaking" to alert [the subsidiary] of problems with its . . . maintenance program.  Even though the occasional visits may have benefited [the subsidiary] or its employees, there is no indication that they were conducted for any purpose other than promoting [] [the subsidiary owner]'s independent self-interests as a stockholder.

*Rick v. R.L.C. Corp.*, No. 82-1059, 1983 U.S. App. LEXIS 12283, at *8 (6th Cir. Dec. 7, 1983). "Evidence that benefits were conferred upon [the subsidiary] or its employees is not sufficient to establish a duty if [] [the parent's] conduct was consistent with an intention primarily to serve its own purposes." *Rick*, 535 F. Supp. at 45.  Henkel personnel testified that their March site visit was conducted to budget for necessary remediation and no review of Magna-Tech's safety program was undertaken other than to verify that Magna-Tech had a safety manual.  (Drzewiecki Dep. 114:20-22, DN 180-2; Drzewiecki Dep. 113:16-18, DN 170-11).

The facts, taken together, indicate that Henkel's sole pre-accident site visit, only months after the initial acquisition, was not for the primary objective of providing an in-depth safety audit or to abrogate Magna-Tech's own safety responsibilities.  To the contrary, it is difficult to conceive a more explicit rejection of any duty for Magna-Tech's safety practices than the statement in Henkel's assessment report that Magna-Tech was responsible for its own equipment.  As in *Rick*, "[t]his conduct is consistent with the view that [the parent] was interested in the operations of []

9

[the subsidiary] from the perspective of a shareholder of [the subsidiary], as well as the view that [] [the parent] acted to gather and provide information about itself and its subsidiaries." *Rick*, 535 F. Supp. at 46.  An interest by the parent of the safety of the subsidiary is not enough, without more, to establish that the parent assumed a duty to provide safety services. *Merrill*, 118 F. App'x at 44.

Maysey also asserts that Henkel had complete financial control over Magna-Tech, demonstrating the degree of influence Henkel had over its subsidiary's operations.  (Pl.'s Mem. Supp. Partial Mot. Summ. J. 6, 16).  While Henkel filed and paid the taxes for its subsidiaries, there was a cash pool arrangement under which either Henkel or Magna-Tech could request to borrow funds from one another through the company's bank accounts.  (Kinney Dep. 43:2-25, June 6, 2019, DN 180-5).[5]  The purpose of the pool arrangement was to "make sure that the entity is liquid, that they can pay their bills and that they don't also build up too much excess cash. (Kinney Dep. 43:2-25, DN 180-5).  In *Rick*, the parent company negotiated insurance on behalf of the subsidiary and was reimbursed by the subsidiary for the management services provided. *Rick*, 1983 U.S. App. LEXIS 12283, at \*3, \*7.  The Sixth Circuit affirmed the district court's holding that the parent had not assumed a duty to undertake safety responsibility for the subsidiary. *Id.* at \*1.  Similarly, Henkel's loan arrangement with Magna-Tech and payment of taxes do not rise to the level of financial control.[6]  (*See* Kinney Dep. 43:2-25, DN 180-5).

---

[5] Maysey also references failure of Henkel to follow the Henkel Code of Conduct, but this document does not appear in the record.  Further, "failure to follow its internal safety policies cannot without more form the basis of liability for [the plaintiff's] accident under Kentucky law." *McCarty v. Covol Fuels No. 2, LLC*, 644 F. App'x 372, 377 (6th Cir. 2016).

[6] Maysey argues "Henkel committed an independent act of negligence by delaying the installation of the guarding until the safety measures were budgeted and approved by Henkel AG in Germany." (Pl.'s Resp. Def.'s Mot. Summ. J. 16, DN 177-1).  Henkel AG is not a party to this case.  Magna-Tech personnel testified that Magna-Tech was "waiting for Henkel to approve" guarding to be added to Line 46.  (Troyer Dep. 41:2-6, DN 177-7).  A Henkel representative testified that he was

Absent a specific *safety* undertaking by Henkel, Maysey contends "Henkel assumed control of both the financial and manufacturing operations of Magna-Tech," by providing risk management, safety, and OSHA compliance services for Magna-Tech after the acquisition.  (Pl.'s Mem. Supp. Partial Mot. Summ. J. 4, 16, DN 170-1).  Although Henkel conducts "environmental and safety training sessions on a variety of topics at all sites," the safety training provided to Maysey was done in accordance with *Magna-Tech's* framework.  (Drzewiecki Dep. 68:9-24, DN 170-3, Sharron Dep. 82:5-11, DN 180-1).  As recognized in *Merrill*, however, "[the] holding of safety meetings and generally promoting safety [are] 'insufficient to create a legal duty under § 324A.'"  *Merrill*, 118 F. App'x at 46 (quoting *McAtee v. Fluor Constructors Int'l, Inc.*, 188 F.3d 508, 1999 WL 685928, at *8 (6th Cir. Aug. 27, 1999)).

The evidence in the record is insufficient to establish Henkel's involvement with Magna-Tech was so pervasive as to assume Magna-Tech's day-to-day safety duties and responsibilities.

---

unsure whether "approval" referred to loan approval or some other form, but a loan, regardless of purpose, would typically be given.  (Kinney Dep. 45:6-15, DN 180-5).  In *Waste Management, Inc. v. Superior Court of San Diego County*, 119 Cal. App. 4th 105 (2004), the court, addressing *Boggs*, found that despite the parent corporation's denial of funds to repair or replace the truck that injured the plaintiff, the parent company was not liable for the safety failure of the subsidiary's trucks because the plaintiff had not established a duty owed by the parent to the employees of the subsidiary.  *Id.* at 111.  The court held that "negligently controlling or intentionally mismanaging a subsidiary's budget does not create a duty on the part of the parent corporation to ensure safety or prevent injuries to the subsidiary's employees."  *Id.*

Accordingly, there is no genuine issue of fact remaining regarding Maysey's negligence claim against Henkel, which will be dismissed.[7, 8]

## B.   Nemak's Motion for Summary Judgment (DN 172)

### 1.   *Premises Liability*

The Court denied Nemak's prior summary judgment motion, ruling that there were questions of fact with regard to Nemak's relationship and potential liability for Maysey's injury. (Mem. Op. & Order 3-8, 11, DN 149). Nemak's current summary judgment motion (DN 172) largely repeats its previously unsuccessful arguments. (DN 134). Nemak acknowledges the ruling on a "similar" motion for summary judgment, but states that "further discovery has taken place including all expert witness discovery and depositions." (Def.'s Mem. Supp. Mot. Summ. J. 5, DN 172-1). Nemak relies upon the opinions of Michael Taubitz ("Taubitz"), who asserts that an arrangement which is effectively "two completely separate operations" is common practice in situations such as the one between Nemak and Magna-Tech. (Taubitz Report 5, DN 172-2).

---

[7] Count III of the Second Amended Complaint alleges a claim for strict liability in tort against Henkel. (Second Am. Compl. ¶¶ 49-53). Maysey fails to establish the applicability of a strict liability claim to the facts at bar. "The very underlying purpose of strict liability is to permit injured parties a method of reaching back to the manufacturer or distributor of commercial products, following some form of failure on the product's part." *Worldwide Equip., Inc. v. Mullins*, 11 S.W.3d 50, 55 (Ky. App. 1999). Maysey has not shown that Henkel was in any way a distributor or manufacturer of Line 46 or any of its component parts. As a result, this claim is also dismissed. Further, Count V states a claim for punitive damages against Henkel, but as Plaintiff's claims against Henkel are being dismissed, the request for punitive damages is moot. (Second Am. Compl. ¶¶ 59-65).

[8] Sedgwick Claims Management Services, Inc. ("Sedgwick"), the workers' compensation carrier providing benefits to Maysey, filed an intervening complaint and adopted Maysey's allegations against Henkel and Nemak. (Intervening Compl. ¶¶ 1-3, DN 47). Maysey's claims against Henkel are being dismissed and therefore Sedgwick's claims against Henkel are correspondingly dismissed.

Taubitz also states that Magna-Tech was solely responsible for the area they exclusively controlled in Nemak's facility.  (*See generally* Taubitz Report).

Nevertheless, Nemak's renewed motion does not cure the deficiency of its prior summary judgment motion.  The Court held that the Service Agreement between Nemak and Magna-Tech did *not* represent a relinquishment of control by Nemak to Magna-Tech of a specific or general area of the plant or of Nemak's right to freely enter Magna-Tech's work area.  (Mem. Op. & Order 4).  Taubitz's Report states that the Service Agreement, which the Court previously reviewed, should be interpreted to give Magna-Tech exclusive control over its premises.  Taubitz's conclusions as a safety expert, however, have no bearing on the contractual interpretation accorded to the Service Agreement, as he cannot testify as to "the legal 'meaning' of certain contractual provisions . . . ."  *In re Com. Money Ctr., Inc.*, 737 F. Supp. 2d 815, 830 (N.D. Ohio 2010).

Further, Nemak argues that "the area [allegedly controlled solely by Magna-Tech] was specifically delineated by markings on the floor, barriers and signage on equipment and beams" but fails to cite to evidence in the record supporting this proposition.  (Def.'s Mem. Supp. Mot. Summ. J. 10).  The Court has no duty to "conduct its own probing investigation of the record." *Guarino v. Brookfield Twp. Trs.*, 980 F.2d 399, 405 (6th Cir. 1992).

Nemak points to no proof to resolve disputed factual issues articulated in the previous Memorandum Opinion & Order.  Furthermore, Nemak's retention of an expert witness does not overcome testimony previously cited, such as the email sent by Nemak's Barry Brown suggesting Nemak's control over the area:

> As I've stated previously, Nemak must ensure that the line is now safe to run in our plant prior to your restart.  Our first requirement is the written safety risk assessment.  If Sean is coming on Friday to assess the equipment for the report, when can we expect the actual report?  We want to ensure that Article 3.2 of our contract is being met.

(Pl.'s Resp. Def.'s Mot. Summ. J. Ex. 3, at 1, DN 136-4).  As previously noted, "Nemak has not pointed to evidence of record to conclusively support its assertion that Magna-Tech possessed 'exclusive' control over the area where Maysey suffered injuries so as to defeat Maysey's claims." (Mem. Op. & Order 9).  Nemak's renewed motion offers expert opinions but has not overcome the factual disputes which undermined its earlier motion.  Conflicting testimony is a question for the jury:  "The weight given to lay and expert testimony and the credibility of such witnesses [is] for the jury to determine."  *Dickerson v. Shepard Warner Elevator Co.*, 287 F.2d 255, 259 (6th Cir. 1961) (citation omitted).  Accordingly, there remain sufficient factual questions to submit the issue of premises liability to the jury, and the motion will be denied on this basis.

### 2. *Kentucky's Workers' Compensation Act*

Nemak submits a nearly identical recitation of its previous argument regarding workers' compensation immunity.  (*See* Def.'s Mem. Supp. Mot. Summ. J. 9-11, DN 134-1; Def.'s Mem. Supp. Mot. Summ. J. 14-16, DN 172-1).  A finding from Taubitz is included to establish that it is common industry practice to have another business entity assist in the production process.  (Def.'s Mot. Summ J. 16).  Taubitz also noted in his report,

> Nemak had no knowledge of impregnation, as succinctly clarified by Mary Byrd on page 14 of her deposition.  She correctly noted that Nemak had die casting ability but no skill or knowledge on impregnation of castings.
>
> For these reasons, I further find that Nemak had no influence on Magna-Tech's means and methods of production and no knowledge of the duties of a centrifuge operator.

(Taubitz Report 9).  Nemak's expert seems to contradict its present assertion that Magna-Tech performed a regular or recurrent part of Nemak's operation since Taubitz disavows any knowledge Nemak may have regarding the impregnation process.  This further reinforces the Court's earlier determination that there is a factual question whether Nemak is entitled to "up the ladder"

immunity under the Kentucky Workers' Compensation Act.  (Mem. Op. & Order 9-11).  Nemak's

motion is therefore denied.

C.  **Motions to Exclude Expert Testimony (DN 168, 169, 171)**

The parties have filed motions seeking to exclude the testimony of several expert witnesses

in this case.  Fed. R. Evid. 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training,
> or education may testify in the form of an opinion or otherwise if:
> (a)      the expert's scientific, technical, or other specialized knowledge will help
>          the trier of fact to understand the evidence or to determine a fact in issue;
> (b)      the testimony is based on sufficient facts or data;
> (c)      the testimony is the product of reliable principles and methods; and
> (d)      the expert has reliably applied the principles and methods to the facts of the
>          case.

Fed. R. Evid. 702.  Under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993),

Fed. R. Evid. 702 and 104(a) require that the trial court act as a gatekeeper and ensure that expert

testimony is both relevant and reliable.  *Id.* at 589; *Conwood Co., L.P. v. U.S. Tobacco Co.*, 290

F.3d 768, 792 (6th Cir. 2002).  The test for relevancy is one of "fit," meaning the testimony must

be sufficiently related to the facts of the case such that it will aid the trier of fact in understanding

the evidence or determining a fact in issue.  *Daubert*, 509 U.S. at 591.  When determining

reliability, a key consideration for the trial court in carrying out its gatekeeping function is

"whether the reasoning or methodology underlying the testimony is sufficiently

valid . . . ."  *Id.* at 592-93.  The Supreme Court has advised, however, that the inquiry is flexible

and that "[t]he focus . . . must be solely on principles and methodology, not on the conclusions that

they generate."  *Id*. at 594-95.

There is no definitive checklist for determining whether an expert's testimony is reliable,

but *Daubert* outlines a non-exhaustive list of factors for courts to consider, such as:  (1) whether

the theory or method in question "can be (and has been) tested"; (2) whether it "has been subjected

15

to peer review and publication"; (3) whether it has a "known or potential rate of error"; and (4) whether the theory or technique enjoys "general acceptance" in the "relevant scientific community . . . ."  *Id*. at 593-94 (citation omitted).

Where a party challenges the testimony of a proffered expert for insufficient "factual basis, data, principles, methods, or their application . . . the trial judge must determine whether the testimony has a reliable basis in the knowledge and experience of [his or her] discipline."  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999) (quoting *Daubert*, 509 U.S. at 592).  *Daubert* involves balancing the desire to liberally admit relevant evidence against the necessity of excluding misrepresentative "junk science."  *Best v. Lowe's Home Ctrs., Inc*., 563 F.3d 171, 176-77 (6th Cir. 2009).  Ultimately, "a trial judge . . . ha[s] considerable leeway in deciding . . . whether particular expert testimony is reliable," and the decision is reviewed for abuse of discretion.  *Kumho Tire*, 526 U.S. at 138-39, 152; *Conwood*, 290 F.3d at 792; *see also Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 672-73 (6th Cir. 2010) ("Rule 702, we recognize, does not require anything approaching absolute certainty.  And where one person sees speculation, we acknowledge, another may see knowledge, which is why the district court enjoys broad discretion over where to draw the line." (internal citation omitted) (citation omitted)).

### 1.    *Maysey's Motion to Exclude Testimony of Michael Taubitz (DN 169)*

Maysey argues that the testimony of Taubitz, Nemak's expert witness, should be excluded to the extent he testifies as to conclusions of law.  (Pl.'s Mot. Exclude 2, DN 169).  The excerpts, in full, that Maysey contests are as follows,

> Q.    What due diligence measures did Nemak undertake to ensure that the safety regulations and internal standards were complied with at the Glasgow work site?
> A.    I'm not sure how to respond to that, sir.  That is a contractual basis that the due diligence that says that Magna-Tech, a recognized, competent employer, is willing to do the things in that agreement.

16

> There is no obligation for auditing or inspection when another business entity is legally responsible for something.

Q.      Well, now, you just stated a legal conclusion . . .

(Taubitz Dep. 27:14-25, Dec. 18, 2020, DN 169-2).  Further, Taubitz testified:

Q.      . . . Essentially you're saying that based on the OSH Act and the ensuing regulations that Nemak has no responsibility at all for this work site accident, is that correct?

A.      Correct.

Q.      Okay.  And based on the OSH Act and ensuing regulations, Nemak has really no legal duty based on those regulations as well, correct?

A.      Correct.

(Taubitz Dep. 76:7-15, DN 169-2).

Q.      With regard to the enforcement of these safety policies and procedures, who is responsible at Nemak for the enforcement of these safety policies and procedures?

A.      Absolutely no one, sir.  Again, Nemak doesn't have to go  back and rewrite existing law put in place by Congress.  It is the OSH Act.

And, again, because I have personal familiarity with these kinds of issues, that is standard language that allows a company like Nemak should they have to exercise authority that has to do with tornadoes or fire or environmental or other things that they now have a contractual basis to say, look, these are the things we have to do.  Therefore, you being on our facility have to do this.

But it does not take over responsibility for the protection of workers.

(Taubitz Dep. 26:2-18, DN 169-2).

It is well settled in the Sixth Circuit that experts typically may not testify regarding legal conclusions.  *Torres v. Cnty. of Oakland*, 758 F.2d 147, 150 (6th Cir. 1985).  It is improper for Taubitz to testify as to whether Nemak had a *duty* to make the premises safe or conduct safety audits or if it is legally responsible under the Occupational Safety & Health Act.  Expert testimony from Taubitz must be limited to "stating opinions that suggest the answer to the ultimate issue or that give the jury all the information from which it can draw inferences as to the ultimate issue." *Berry v. City of Detroit*, 25 F.3d 1342, 1353 (6th Cir. 1994).  Taubitz is not precluded from testifying nor discussing the Service Agreement, but may do so within the realm of his experience

17

in the field.  To the extent Taubitz offers legal conclusions, such testimony will be precluded at trial.

      **2.**      ***Nemak's Motion to Exclude Testimony of Dr. Thomas Huston (DN 171)***

      Nemak objects to the testimony of Dr. Thomas R. Huston ("Huston"), Maysey's expert. (Def.'s Mot. Exclude 1, DN 171).  Nemak takes issue with Huston's opinion that, based on the Service Agreement, Nemak retained the right to control the worksite and therefore contributed to Magna-Tech's failure to comply with safety policies.  (Def.'s Mot. Exclude 7).  Like Taubitz, Huston will not be permitted to testify regarding the legal meaning of the Service Agreement. Nevertheless, Huston's opinion that Nemak's failure to monitor Magna-Tech and comply with its own policies was a contributing factor to Maysey's injury would be admissible to the extent that it is based on sufficient factual evidence. Fed. R. Civ. P. 702.  Huston does not attempt to explain the meaning of the Service Agreement in his report, but opines that Nemak failed to meet the responsibilities it had reserved in the Service Agreement.  (Huston Report 14).

      Nemak argues that Huston's testimony is unreliable because, "Dr. Huston's lack of requisite knowledge as it relates to workplace safety in a scenario such as this case should preclude him from offering opinions as it will not assist the trier of fact." (Def.'s Mot. Exclude 8).  The Court's role is to examine "not the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question." *Smelser v. Norfolk S. Ry. Co.*, 105 F.3d 299, 303 (6th Cir. 1997) (quoting *Berry*, 25 F.3d at 1351).  "Experts are permitted wide latitude in their opinions, including those not based on firsthand knowledge, so long as 'the expert's opinion [has] a reliable basis in the knowledge and experience of the

18

discipline.'" *Jahn v. Equine Servs., PSC*, 233 F.3d 382, 388 (6th Cir. 2000) (alteration in original) (quoting *Daubert*, 509 U.S. at 592).

Huston performed an assessment of the worksite following the accident and his report is based on a near entirety of the factual record and independent safety and design materials.  (Huston Dep. 7:12-15, Nov. 11, 2020, DN 171-2; Huston Report 3-4, DN 171-1).  Huston has a Ph.D. in Industrial Engineering, serves a professor of engineering at the University of Cincinnati, and has consulted for numerous law firms.  (Huston Report 20, 22-26).  Huston's assessment of the worksite and extensive experience in the engineering field permit him to opine regarding deviations he has identified from common engineering safety practices.  Huston does not specifically determine duty or breach but asserts that Nemak's failure to follow its responsibilities in the Service Agreement contributed to Maysey's injury.  (Huston Report 14).  Huston's opinions as to Nemak appear to be summed up in a singular paragraph from his report:

> This investigator is also critical of Nemak.  In contrast to its policy, Nemak did not complete a safety review or risk assessment when the equipment of Line 46 was installed on its premises.  Nemak through its Services Agreement with Magna Tech had control over the worksite for ensuring that Magna-Tech complied with Nemak's safety policies and governmental safety regulations.  It is also this investigator's opinion that Nemak's failure to enforce this control was a contributing factor in creating an unreasonably dangerous worksite on the premises of Plant #2.

(Huston Report 14).

Like Taubitz, Huston is not permitted to state legal conclusions regarding whether Nemak had a duty.  Otherwise, Huston will be permitted to testify.  This motion will be granted in part and denied in part.

### 3.    *Maysey's Motion to Exclude Testimony of Scott Dunlap (DN 168)*

Maysey has also moved to exclude the expert testimony of Scott Dunlap, who is a retained expert for Henkel.  (Pl.'s Mot. Exclude 2-4, DN 168).  As the claims against Henkel have been

dismissed as discussed above, testimony from Henkel's expert will no longer be applicable moving forward.  Accordingly, this motion will be denied as moot.

## IV.   <u>CONCLUSION</u>

For the reasons outlined above, **IT IS HEREBY ORDERED** as follows:

1.      Henkel's Motion for Summary Judgment (DN 173) is **GRANTED**.

2.      Maysey's Partial Motion for Summary Judgment against Henkel Corporation (DN 170) is **DENIED**.

3.      Nemak's Motion for Summary Judgment (DN 172) is **DENIED**.

4.      Maysey's Motion to Exclude Testimony of Nemak's Michael Taubitz (DN 169) is **GRANTED**.

5.      Nemak's Motion to Exclude the Testimony of Plaintiff's Expert Dr. Thomas R. Huston (DN 171) is **GRANTED IN PART** and **DENIED IN PART**.

6.      Maysey's Motion  to Exclude the Expert Testimony of Henkel's Scott Dunlap (DN 168) is **DENIED AS MOOT**.

Greg N. Stivers, Chief Judge
United States District Court

March 31, 2022

cc:     counsel of record